and we will hear argument in Jackson v. Galaza. Good morning, Your Honors. My name is Larry D. Bray. I'm here on behalf of the petitioner, Frederick L. Jackson. Before we go into our argument, we would like to state that for all of the issues that we are unable to cover before this Court orally, we rely on our brief to cover those issues, both Mr. Jackson's informal brief as well as my supplemental brief. And we also would like to reserve three minutes of rebuttal time. You may do so, counsel. Your Honor, it is significant that the district court and all of the claims that were presented to him found, in fact, that they were air. But he simply went on to find that it was only harmless air. And because it was only harmless air, Mr. Jackson was not prejudiced and, therefore, he did not deserve a grant of habeas corpus. Therefore, it would appear that our position here and the thrust of our argument here should be to demonstrate to the Court that, in fact, these harmless air were not harmless and, therefore, they should be released, should be granted on the basis that they are not harmless. First, as you know, we're not on a direct criminal appeal here. We're on a habeas review. So the standard of review is a little different. That's correct, Your Honor. But before we address the issues of harmless air, we would like to begin with the issue of whether or not, first of all, did the government breach the stipulation that was made between Mr. Jackson and the prosecution? And then what is the result of that, the breach of that stipulation? Because we believe that if the Court resolved, and we believe it should, find the fact that the stipulation was breached, then in and of itself, according to this Court, that is reversible error in terms of a direct appeal. And on habeas, it should be enough for a grant of habeas corpus relief. We begin by, first of all, it was clear in the record that there was a stipulation between Mr. Jackson and the government that certain evidence on the audio tape should not have been presented to the jury. This was agreed to between Mr. Jackson and the government, and there is no dispute about this. The district court found that, and Mr. Jackson presented it in his habeas corpus petition. This Court in the United States v. Shapiro found there were three matters that pertain to the stipulation. First of all, the stipulations are similar to plea agreements. The Court also found the stipulations are binding on the government. And finally, it found in Shapiro that a breach of the stipulation was reversible error. That's a California rule, isn't it? That's a California decision, sir. That's correct. Oh, no, excuse me, Your Honor. No, the United States v. Shapiro is a federal case. That was decided by the Ninth Circuit. It's a Ninth Circuit case. It's not a California case. Well, but you are appealing on a – you've got a habeas case. That's correct, Your Honor. Okay. And so you've got to show that whatever error occurred has constitutional dimensions. That's correct, Your Honor. Or there's a relief in the federal court. That's correct, Your Honor. I mean, you could have got a relief in the state court, but you didn't get it. You understand what I'm trying to say? Yes, I understand, Your Honor. Well, now you have to show us a constitutional violation. And I don't see that the comment about it maybe went a little too far. Maybe it did, but tell me where the constitutional violation is. Well, the constitutional violation basically is the violation of Mr. Jackson's right to a fair trial by the introduction of that evidence. But we're contending that not only was it instrumental in denying him a fair trial, but as a matter of law, because the stipulation was breached, it is in fact prejudicial error. And because it is prejudicial error, then the court should have found so, and Mr. Jackson should have been granted habeas corpus relief. Now … Mr. Gray, wasn't there a curative instruction given by the judge in this respect to that? There was a curative instruction given, Your Honor, but our position is that it's really irrelevant because in the case of United States v. Johnson, this court, again, the United States Circuit held that a harmless error analysis is not relevant to the breach of a plea agreement, that you really don't even count it within that analysis. Once it is shown that the stipulation of the agreement has been breached, then that in itself, the court imposes prejudice. And since this is on the basis of habeas corpus, then we feel that it's a basis for a grant of habeas corpus and a reversal of his conviction and a grant of habeas corpus. Now, if the court does not find, as we have argued, that the very violation of the stipulation itself is a valid basis for a finding of a grant of habeas corpus, then we contend that the harmless error that the court found, in fact, were not harmless, and that each point that was made that the court conceded was error. Even if you look at it in a totality of the errors, which we did present a cumulative error argument, that each of the errors combined would present … it would not be harmless, would cause the habeas corpus petition to be granted. Would you address one thing? When I looked at all of the opinions up to this point, they seem to lump harmless error into a big basically single analysis, and they don't split out between the rape and the murder. That's correct, Your Honor. And so my question, I'll just tell you kind of my instinct, and I want to look at the record, is with the rape, it's pretty hard to overcome that evidence. But I would be interested in a focus on the murder and what evidence there would be and how these errors that you talk about, the Miranda and other errors, the Doyle, alleged Doyle error, how that would affect the murder conviction. Well, Your Honor, first of all, the only reason there is a murder conviction is relying on the felony murder rule. In fact, without the felony murder rule, there would be no murder conviction for Mr. Jackson. And what the court found was that because there was a rape, then, in fact, because of felony murder, it was a murder also that he was charged with. So I think we can concentrate on the rape because without the rape, there would be no felony murder for Mr. Jackson. However, in response to your question, Your Honor, the court found simply, and first, let me go back, I would have to disagree with you, Your Honor, there was overwhelming evidence. Our position is that the only real evidence that they had against Mr. Jackson was the DNA evidence, and the only real physical evidence. We discount that evidence for Mr. Roland because the district court conceded himself that he was extensively impeached on cross-examination. I mean, even to the extent that he admitted that they made up him and Mr. Sadler made up a story. So we discount Mr. Roland's testimony in terms of his credibility. Again, the district court asserted on the record that he was extensively impeached. So we contend that the only real evidence that they had against Mr. Jackson was the DNA evidence. And the DNA evidence alone, Your Honor, does not prove rape. The only thing the DNA evidence proves is that there's a likelihood that Mr. Jackson had intercourse or sex with Ms. Gonzalez. And the likelihood of sex does not compute to rape. It just means in some way that he had sex with her. So from there, you cannot make the leap that he raped her. Now, even as we explained in our brief, Your Honor, even if you rely on Mr. Roland's testimony and gave it some credibility, there still would not be enough evidence to show that Mr. Jackson raped Ms. Gonzalez. The only thing it showed with Mr. Roland's testimony is that, in fact, they were having sex. According to his testimony, they were having sex in the back seat of the car. How much time was he given on the rape? Six years, Your Honor, I believe. But he was given a lot more in the murder. Exactly, Your Honor. Life without parole. On your stipulation, where you're saying we ought to give constitutional release, there are a couple of remarks that this fellow had been in prison. There were other indications that he'd been in prison. And I think you ought to go and talk about the Miranda Rule a little bit. All right, Your Honor. There you've got a possible constitutional violation that deals with the murder charge. Okay, Your Honor. As far as the Miranda argument is concerned, again, and let me say that we relied on the violation of Miranda itself as opposed to the district court. The district court said there was two ways he could look at this. He could look at this in terms of the right to remain silent and whether that statement, and we are speaking of now the third statement, whether that statement was voluntarily made by Mr. Jackson or was it just a violation of his Miranda rights. We decided to argue in our brief, at least in the supplemental brief, that it was just we concentrated on the Miranda argument itself. In fact, that with the third statement, because the officer failed to give Mr. Jackson his Miranda rights, that in and of itself prevented the statement from being admitted at trial. And therefore, and by relying on The statement was a statement that he was present. He happened to be there, sir. And under the felony murder statute, that was pretty strong as evidence against him. Yes, sir. The government had to rely on a witness who turned, isn't that right? That's correct, Your Honor. Because otherwise you have, even if you think there's been the rape problem, there is this hiatus or at least some hiatus between the sex, intercourse, rape, whatever it ends up being, and the woman getting shot in the head. That is correct, Your Honor. Because the initial statement that Mr. Rollins made was just that Ms. Gonzales had made a statement to Mr. Jackson. Mr. Jackson then cursed at him. I used some words. And that if I was fixing that, after he had did that, that he had, that Mr. Jackson had somehow sanctioned Ms. Gonzales. I think he claimed that he hit her. But at no time at that particular time, in that particular moment, had he discussed sex. He just said at that time that she had made a remark, I think in Spanish or something, and that he retaliated. And then he left the scene. Mr. Rollins left the scene. When he returned to the scene, at that time he claimed that there was sex going on between Ms. Gonzales and Mr. Jackson. But at no time at that point could any evidence or conclusion be made that Mr. Jackson was raping Ms. Gonzales. It very well could have been that it was consensual sex. That because of the earlier act of her calling him a name and him retaliating, that she had made up. In fact, both consented to that sex. Other than his statement, you know, I don't want to talk about it anymore. And then he says, well, of course, you know, I just happened to be there. Other than that statement, what places him at the scene of the murder? Other than that statement, Your Honor, it really doesn't, it really there's no other evidence that places him at the scene of the murder other than Mr. Rollins claiming that the car, the vehicle was there, they had sex.  Mr. Rollins admitted that the lady who was pushed out of the car and then Mr. Satterthwaite took her over to the dish at that time. Of course, I would continue that we disagree. We have a different version of the facts. But even if the court relied on these facts, there was no connection between Mr. Jackson and the murder itself. Again, Your Honor, the only connection that they had was that Mr. Jackson had sex and the court relied on him raping her. And it fell in the murder rule to connect him with the murder of Ms. Gonzalez. Even Mr. Rollins with his impeachable testimony did not claim that Mr. Jackson in any way murdered Ms. Gonzalez. All he claimed was somehow that he was at the scene. And because the statement that Mr. Jackson made provided the corroboration for Mr. Rollins, even though the court had admitted that he had been impeached, with that corroboration, then it made a strong impact to place him at the scene. And because if he was at the scene, then the jury with this, and this is what caused the other evidence, Your Honor, to be incriminating, very incriminating and not harmless to Mr. Jackson. Because then the jury could infer that if he was at the scene and all the rest of this stuff that's coming in, that he was in prison and this and that and the other, that he must have been that type of person who could have committed the acts that he committed. And therefore, that's why it was so important for the state to have that statement admitted. Is there any question but that there was no Miranda warning here and there was no waiver? There's no question, Your Honor, that with the third interview that there was no Miranda warnings. And this is what happened. And that's why I said. And no waiver. And no post-mortem. And no waiver, Your Honor. Here's what happened with the way the district court arrived at his conclusion. And this is why we got away from utilizing the voluntary statement as opposed to just a violation of Miranda itself. When you use the voluntary statement, then you must refer it back to the two previous interviews. And the court said that Mr. Jackson had cut off any communication with talking to the police after the second interview. And he found that with the third interview that at that point his statement was not voluntary. But in order to get to that voluntary issue, you would have to go back to the other two statements. If you rely on Miranda alone, the other two statements are irrelevant. We are contending that he was not given his Miranda rights at the third interview. And because he was not. And there's no dispute about that in the record. I'm looking at the California Court of Appeal decision here. And they look at it in terms of people versus Harris and say that based on that it was volunteered. What's your comment on that? That's correct, Your Honor. Again, you have to go back to we contend that it was not voluntary, that he actually had cut off the interview process as of the second interview. And our position is that since he had cut it off after the second interview, that he was not allowed to come and speak with him again. And his statement was not voluntary. But in addition to that, he did not. First of all, and again, Harris required that he re-Miranda-ized him again. And he did not give him the Miranda ones again at the third interview. So that would also add to a violation of the voluntariness. You have about four minutes. You can reserve it or keep going whenever you like. Okay. Well, I think, Your Honor, basically, again, just in summation, before we come back, that it is our position that the most significant issue is that they violated the stipulation between Mr. Jackson and the government not to play that tape. And that as the Ninth Circuit has held, that a violation of that agreement is a loan. There cannot be any harmless error, so the court wouldn't even have to go to a harmless error review. And therefore, that in itself should be enough to show that he didn't receive a fair trial and there should be a reversal. Thank you, Counsel. Mr. Tarl? Tarl. Tarl. Correct. Very few people get that on the first try. Good morning, Your Honors. There are – Introduce yourself for the record, please. Excuse me. Scott Tarl, Deputy Attorney General for Appellee. There are two ways to go about this case, as my colleague said, and one of them is the state court way, which found no Miranda issue. Another is the district court way, which found – Sure. Another one is the – there are two ways to look at this. The state court way, which is finding no Miranda error, and the district court way, which was basically finding no prejudice. These facts are admissible on the Miranda issue. The prisoner, the petitioner, said at least three times, I don't want to talk about it. And under Miranda, the rule is when the prisoner or the petitioner says, I don't want to talk about it, you've got to stop. It was in custody. Correct. And the policeman, investigator, kept asking, and then he said, okay, I'm going to quit. And the guy says, you know, I didn't – I wasn't the shooter. And then he admitted he was there, which is really, in the context of this case, very damaging evidence. Why isn't that as a matter – a matter that the district court decided was a violation of Miranda? I have trouble with that, with what the California court said while it was volunteered. Tell me which way we should go, whether we should go the district court way or go the California way or neither. Okay. Well, there are actually – it's an interesting thing about these facts. There are two ways to look at them. And this was all on tape, by the way, so that the trial court was able to hear the demeanor of both parties to this conversation. But one way to look at it, and this is – I don't know if it's in the record, if it was ever lodged in the habeas proceedings. I'll see if we can possibly do that. I'll check to see if it's in the district court record, which I think would be a prerequisite for your having it. But I'll look into that. But the way that I think that the state court arrived at its finding is this. If you look at that whole conversation, as you might call it, where the sergeant is continuing to talk to him – and I'll admit this is at the very least a close call and a Miranda issue. But what's interesting is that throughout that whole conversation, the defendant, Mr. Jackson, doesn't budge. He doesn't cave in. He doesn't back down. He's going to be silent. He's not going to talk. It's only after the detective, I believe it was, announces, okay, I gave it my best shot and is starting to prepare to leave. In other words, signaling what the state court of appeal found was essentially a goodbye, signaling I give up, okay, you're not going to talk. The purpose of Miranda, among other things, is to enable a person not to incriminate himself and to know that under the Fifth Amendment applicable to the states, under the 14th, you don't have to speak to the policeman and you've got constitutional rights. That is true, Your Honor. And let's even assume for the sake of argument just for now that all of that conversation that the detective had with him was improper. Nevertheless, he didn't back down and only when he's saying goodbye, a state court looking at these facts could interpret it as that it wasn't something that wore down his resistance. What it was is that the petitioner, the defendant, was crowing in triumph. You're giving up. You didn't get me. I beat the rap. Isn't the whole point of Mosley in those cases is, you know, you can't keep throwing it out there. He says, you're not willing to talk. No, sir. You want to talk to me? And then he says, no, I couldn't tell you anymore. You have nothing to say. I have nothing to say. Nothing to say. You want to write it out. You know, you're going to find out later. Do what you have to do. He doesn't want to do it. You know, how many times do you say no? How many ways can you say no? And then Eureka. I agree with you. That was volunteered. I agree with you. Obviously, if I could pick the facts, I wouldn't have picked this. No, I know. You didn't make the facts. Right. But still, under Rhode Island v. McInnes, you look at whether there's something that's the equivalent of interrogation. And what the state court did was looked at the last statement as being the equivalent of interrogation. The district court looked at the whole conversation. But I think the reason that the state court looked at that last statement is because it was of the opinion that it was simply the It wasn't all of this wearing down that got him to talk. It was simply the officers admitting defeat and giving up that got him to crow and triumph. Aha, you didn't get me. That's the point of Miranda is he shouldn't have If there was any question of whether he wanted to talk again, and he hasn't been re-Miranda-ized at this point, and he says no, What's the purpose of Miranda if you aren't supposed to just zip your lips? Well, imagine if the facts had gone this way, and I'll draw an analogy, though. Okay. Suppose that the first time he asked, do you want to talk about it? He said, flatly, no. And he said, okay. I decided to give it a best shot and end it there. And then the petitioner suddenly jumped up and said all of this. One could look at it and say, well, that last statement, did that trigger, was that interrogatory? No, but the difference here is you've got three interviews, correct? Correct. And you've got a history here, and you've got his statements. And then the problem, one of the other difficulties I have that would be helpful for you to address is it's one thing to have him say that, but then the prosecutor manages to weave in his silence into the closing, like, well, you know, only guilty people would do something like this. Two or three times they weave in the fact of how he ended the interviews and doesn't want to say. Why isn't the combination of these things put you in a situation that's not harmless error with respect to at least this crucial fact of his presence at the murder? I'm glad that you asked that, because I do want to devote most of my time to harmlessness, actually. And I sense from your questionings to Mr. Bray that you see the crucial thing as linking the rape to the murder, that the evidence is overwhelming that not only that he had sex with the victim, but that it was a rape. Well, the evidence there is more persuasive than anything else. I don't know what the result is until we reread the transcript again. But if you look at the state that the victim was found in, her body in the ditch was unclothed from the waist up. Her bra was pushed up. Her breasts were exposed. And then the coroner finding not only the coroner... Don't you have to do all those things to have sex usually? But would she still be like that when she's shot dead? I don't know how much time it was afterward if the rape and the murder weren't so intimately connected. And then you have the coroner and the sexual assault examiner stating not only was there such overwhelming evidence of vaginal trauma to support rape, but it was so severe that they could specifically find that it must have been while she was in a lying down position, which is interesting because it contradicts the defendant, Mr. Jackson's statement that he had consensual sex with her standing up in the laundry room. And it corroborates Mr. Rowland's statement about what positions they were in in the car, that he was on top of her. And another interesting fact about that, though... Before you leave the Miranda issue, we do have a state court of appeal, judicial review, applying, I guess, state law, the Harris case. But nevertheless, when we look at the AEDPA standard, does this fit within the rule that this is not inconsistent with Supreme Court law? I would argue that it does. I would do more than just submit on that. I would state that obviously it's a very deferential standard. And the way that I explain the facts, which I think is a reasonable interpretation of them, is that perhaps there was an improper belonged questioning, but that that belonged questioning didn't actually result in any statement coming from Mr. Jackson, but that only a non-interrogatory statement of, I give up, go bye, caused him to crow and triumph. You didn't get me. My question is more precise. The court of appeal was interpreting Miranda and applying its own state... The Harris decision. Now, under those circumstances, is that the kind of finding that we should defer to under the AEDPA standard, or does it simply not apply? I guess that's what I'm trying to find out. You mean the reliance on the Harris case at all, the state decision on Miranda? Well, the state interpretation of Miranda has applied to this case. I would think so. There's not a U.S. Supreme Court. Well, the U.S. Supreme Court authority is clear, and I think the district court even conceded they went to the right authority here. The application, again, if you view the facts in the way that I just argued, which I think is a reasonable view, not necessarily the only view, but a reasonable view of the facts here, that under Rhode Island v. McGuinness, you would say that that last statement was not interrogatory, and as a matter of mixed question of fact and law, that that first long conversation didn't have an actual impact at all on the petitioner. And that's the way that you could arrive at finding at reasonably applying U.S. Supreme Court law to reach the decision that the state court did. In other words, you're saying this state court finding is not inconsistent with Miranda and his progeny. Correct. Based on the facts of the case and the way one reasonable interpretation of the facts. We're not basing it on ceiling. Certainly. Our argument is based on the facts of the case. Your position is that that was not an unreasonable interpretation of the application or not. Miranda didn't apply because it was voluntary. That's the way you'd have to end up. Correct, Your Honor. I'm not trying to argue. No, certainly. That would be our position. But equally, our position that the harmlessness which the district court found is well supported. And to get back to Judge McEwen's concern about linking them, an interesting fact is that the victim had a blunt trauma to the head, which was found to be sufficient to render her unconscious. And according to Roland's description of what went on during the rape, the defendant beat the victim severely before the sex occurred. And that's consistent with finding that the defendant knocked her unconscious. And that's logical and easy to understand. But the interesting thing is that when the body is taken to the ditch and shot, she's still unconscious. And we know that for a couple reasons. We know that not only because Roland said so, but we also know that because there's only one set of footprints going down to the ditch from the car, and it's the Nikes that Mr. Saddy White was wearing. And just logically, you wouldn't expect the victim to simply cooperate and allow herself to be carried without a struggle and lie in the ditch and be shot. It's common sense that she was still unconscious from a blow. We don't know that, though, do we? That she was unconscious at the time of the death. I think the evidence is absolutely overwhelming. There's only one set of footprints. She had to have been carried there. Only one set means only one person carried her. There couldn't have been really a struggle. And this was a struggling woman at first, as we know, earlier, before the rape occurred. And second of all, just the fact of how it was done, execution style. You take a person out of a car. They're not going to resist. They're not going to struggle. They're never once going to plant their feet on the ground. You're going to put her still unclothed, completely nude from the breast down. Put her face up on the ground. And there's no resistance to her then being shot three times in the head. I think it's overwhelming that she was still unconscious at the time that all this happened. And that suggests that these events happened within a fairly recent timeframe from when the rape occurred, when the blow was inflicted apparently before the rape. And that tends to link it. And furthermore, we've got Mr. Rollins' testimony. And again, placing him there. And again, he has reasons to impeach him. But he is corroborated not only by the DNA evidence and the coroner's evidence about the rape and the fact that it had to have been the petitioner, but consistent statements he'd made to various other people too. And Lydia Satiewhite, the sister of the actual shooter, her statement to a prosecutor's investigator that they talked about it and that they said we picked up this girl on 7th Street. Fred, who is the defendant, Mr. Jackson, raped her. And then she ended up dead. And that Chris, Mr. Satiewhite, shot her. Can I just go back on one thing? Sure. There's no dispute that he had sex with her, correct? Correct. There couldn't be. Right. So how does the DNA evidence corroborate Mr. Rollins? I just want to understand if I missed something. Because Mr. Rollins made the statement that Lydia Satiewhite repeated, which was basically that Fred, the defendant, raped her, and that Chris Satiewhite later shot her, which puts the gun in Chris Satiewhite's hand, puts the act of rape in Mr. Jackson's. I know, but the DNA evidence. And the DNA evidence corroborates that. Admits that he had sex. So I'm not sure how the DNA corroborates Mr. Rollins. That's all I was trying to understand at that point. Maybe I'm missing something. Well, Mr. Rollins named the right person as the person that raped her. And then we have Mr. Wells. He was the person that owned the gun. He lent the gun to Mr. Satiewhite, the actual shooter, and some time after the murder Mr. Satiewhite returned it to him, and Mr. Wells testified in court. All these facts are, by the way, in the report and recommendation in the excerpts of record. He returned the gun with blood on it, and Mr. Satiewhite kind of all but admitted, you know, by answering a question in a certain way that this gun was used in that murder that was just described in the papers. So we have Wells' testimony corroborating that part of Rollins' testimony, making Mr. Satiewhite the actual killer. We have the statement to Lydia Satiewhite, which is corroborated by this other physical evidence, and corroborating Rollins' statement on who did what in the murder. And furthermore, we have Petitioner's own statements in that second interview, not the one that has a Miranda issue, but that second one where he says that he had heard from the other perpetrators that the victim was tossed up, which was explained to me, when she was raped and murdered. It suggests that this was all together a linked thing. And one more thing that I'd want to point out, just to undercut slightly how important, nevertheless, a statement of admitting being at the scene of the crime was to all of this. I think there was a jury question here, and an important one, whether he was, even if it were stipulated that he was at the scene of the crime. There remains an important question. Did he, nevertheless, have anything to do with the murder? Did he know that the woman was going to be shot after he raped her, even if he did rape her? Absolutely. This statement goes neither here nor there, as far as that. If anything, it actually cuts against that. The statement was, you know I didn't shoot her. You know I just happened to be there. You know it wasn't planned. If a jury trying to figure out, okay, well, maybe he raped her, maybe he was there at the scene, but couldn't it have been Mr. Sati White that just took her and killed her and he had no idea that was going to happen? This statement wouldn't have made a difference in solving that question. This statement doesn't admit that to anything. It goes the other way on that. And that undercuts, I think, the impact of the statement. If there were any other... Do you want to say something about the second issue, the stipulation point? That would be the tape that some part of it was supposed to have been deleted and it wasn't deleted. Well, there's no question that some of that information, which should not have gotten in, did, in fact, get in. And there was a stipulation in... That was there. You heard Mr. Bray's argument. What's your response? I think when he's talking about stipulations, he's talking about a completely different type of thing, more akin to a plea bargain. The government stipulates... All it stipulated to was that the references to being a prole would be redacted. Right. Isn't that right? It basically amounts to just an agreement between the two attorneys that this piece of evidence is not admissible under the rules of evidence. We admit it. It should be redacted. We're going to keep it out. It was an agreement of that sort. But it got in nevertheless. Right. And the question, there's no question that that was error that it got in. The question is, can that be subject to harmlessness? And my colleague, Mr. Bray, seems to suggest that, no, it's automatically reversible per se, just because the agreement between two attorneys had this word stipulation, or at least he attaches the word stipulation to it. I'm not familiar with any case law that would support that proposition. I'm not aware of any case law that would support that proposition either. It would if you were looking at cumulative error. You'd have to throw that into the pot, wouldn't you? Right. Yes. Okay. But when you look at cumulative error, and I know that the district court actually had some reservations about applying cumulative error. I would admit that cumulative error would probably apply. But I think that this contributes nothing to the pot because that same tape has the defendant's own statements that he'd been in and out of prison, that he met Mr. Rollins before in jail, that he's currently on parole. Out of his own mouth, and there was never, at least nothing in the record suggests there was ever any attempt to keep all of that out, just this one statement. And I don't know how that, merely duplicative of what the petitioner said, could contribute anything to that pot. I think what's in the pot is if this court finds it was Miranda error, and if this court finds that it survives the deference standard of AEDPA, the only thing that has to be that one statement of, you know, I didn't do it. I just happened to be there. It wasn't planned. And perhaps the prosecutor mentioning that statement. Because the other claims of Doyle error, would the panel like me to address the other claims of Doyle error that I think had to do with the second and the first interview? And those were just based on the fact that he told the story, which the evidence showed was false, or that was contradicted by his later statements. Why didn't he tell the truth at those prior interviews? That's the type of thing that Doyle clearly doesn't apply to. Doyle doesn't apply to a defendant that chooses to waive Miranda and speaks, and then says something impeachable. There's a case called Charles, I believe, which is a definitive case on that. But this own circuit, this own court's case with McKenna also holds that when a defendant makes a statement, it's not just a statement.  And I don't think it's appropriate to comment on that, and even to comment on the cutoff. Because in McKenna, the statement that was presented into evidence that the prosecutor commented on was simply a statement, I don't want to talk, I don't want to implicate or to incriminate anybody else in this. I won't give you a written statement. That was all that the defendant said in McKenna, and this Court found it wasn't true. Your Honor, we would like to use this time to emphasize the fact that as much as the government and the district court argued that there was overwhelming evidence and this is what made the errors harmless, we contend that in fact there was almost no evidence upon which they could have convicted Mr. Jackson for murder was the statement that I was there, other than that. Was he charged? Was it conspiracy or felony murder or what? The charge was rape and murder based on felony murder. Not the fact that he committed the murder, but because he committed a felony in the commission of a murder is that that's why he was charged with murder and given life without parole. And this is without... The felony murder was... Was the rape. Was the connection with the rape? Exactly. Because he was found to have raped the girl and this rape occurred during the commission of a murder, then he was charged with... What happened to Sathaway, Dash, or Fruder? Was he dead or... Was he dead? No. He was convicted of the murder also. But Rollins was not. And Rollins was not served. Rollins had to deal with the government for his testimony. So we would like to end with it is our position, Your Honor, that if this court does find that in fact the errors were not harmless, that the evidence was so insufficient that the government should not be allowed to retry Mr. Jackson. That the evidence was so insufficient that double jeopardy should apply and that he should not be... The government should not be able to reply him again. I haven't seen that in the brief. We did argue, Your Honor, that the sufficiency in our reply brief because the government had consistently contended that there was overwhelming evidence. And in fact there was no overwhelming evidence and the only real evidence that they had was the DNA in terms of physical evidence. Even the statement, and let me end with this, even the statement I was there had two interpretations, Your Honor, because it's Mr. Jackson's position that he was there was after the incident had occurred. The murder had occurred, that he arrived on the scene afterwards. But on that statement, what is your position with respect to his saying that? Was it inspired by something that the police officer said he was getting ready to leave the jail cell? Or just it should be excluded because it was not Mirandized at all? Our position is it should be excluded because it wasn't Mirandized at all. When this third interview began, the police officer had a duty to give him his Miranda rights in which he did not give him his Miranda rights. So that would apply to anything that he said? It should not apply to anything. Anything after doing that interview should not come in, should not be admissible because it was not Mirandized at the beginning. And the police officer knew that the purpose of the interview was interrogation. Thank you, sir. Thank you, counsel. The case just argued will be submitted for decision.
judges: Bright , O'scannlain, McKeown